IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORPORATION; AMERITAS INVESTMENT CORPORATION; and AMERITAS HOLDING COMPANY,<br><br>Plaintiffs,<br><br>vs.<br><br>FEDERAL INSURANCE COMPANY,<br><br>Defendant. | 4:16-CV-3006<br><br>MEMORANDUM AND ORDER |

The defendant, Federal Insurance Company, issued a financial institution bond to plaintiffs AmeritasLife Insurance, Ameritas Investment, and Ameritas Holding Company (collectively, "Ameritas"). Pursuant to the bond, Federal agreed to indemnify Ameritas for losses sustained directly from employee dishonesty. Ameritas submitted a claim under the bond after a former contractor, Jason Muskey, stole over $2,000,000.00 from Ameritas' customers. Federal denied the claim in part, concluding that not all of Ameritas' losses were the direct result of Muskey's actions. Ameritas has sued Federal for breach of contract, and both parties have moved for summary judgment. For the reasons explained below, Federal's motion will be granted, and Ameritas' motion will be denied.

BACKGROUND

The following facts are not meaningfully disputed. Ameritas is composed of several Nebraska-based corporations that sell insurance and securities throughout the United States. Filing 91 at 5. As part of its business, Ameritas retains independent contractors to solicit its products and

services to individual customers. *See* filing 1 at 2-3. From 2010 to 2012, Ameritas contracted with Jason Muskey, a financial advisor and insurance agent, to perform that task through his Pennsylvania-based company, Muskey Financial. Filing 87 at 5; *see* filings 1-1 to 1-5.

In 2014, Ameritas was notified that Muskey Financial was closing, and that "there was a whispering in the office that monies had been converted inappropriately." Filing 87 at 5. A subsequent investigation revealed that Muskey had, in fact, stolen funds from at least 25 Ameritas customers using two separate, yet related schemes. Filing 91 at 2. The first scheme involved direct withdrawals from customer accounts. To that end, Muskey would, without his customers' permission, fill out and submit monetary withdrawal forms using his clients' personal information. Filing 88-2 at 9. Ameritas, believing the requests to be legitimate, sent checks in the clients' names to the addresses provided. Filing 88-2 at 9. Unknown to Ameritas, the checks were actually going to Muskey's office address, where Muskey would endorse the checks to himself through forged signatures. Filing 88-2 at 9-10.

In the second scheme, Muskey convinced customers to voluntarily transfer funds from their personal investment or banking accounts to Muskey Financial. *See* filing 88-2 at 10; filing 91 at 11-12. He did so by falsely informing his clients that their money would be reinvested in other non-Ameritas investment products, such as annuities or money market accounts. *See* filing 88-2 at 9, 24, 29. Rather than reinvesting the money, however, he pocketed the funds and "create[d] fraudulent documents to evidence . . . investments that didn't exist." Filing 88-2 at 9. Muskey perpetrated this scheme against at least 10 different individuals and families, acquiring approximately $779,342.88 in stolen funds. Filing 91 at 9-12.

Victims of both schemes sought reimbursement from Ameritas, arguing that the company was vicariously liable for Muskey's actions. *See* filing 91 at 5-6. Ameritas settled those claims, paying out over $2,000,000 in compensation. *See* filing 1 at 3; filing 91 at 12; filing 88-3. Of that amount, $1,301,783.35 was paid to victims of "scheme one"—that is, people whose accounts Muskey withdrew from without their permission. Filing 91 at 12. An additional $779,342.88 was paid to victims of "scheme two." Filing 91 at 12; filing 101 at 13. Those individuals, as described above, voluntarily withdrew or transferred funds to Muskey for reinvestment.

Ameritas, seeking coverage for its losses, filed a claim with Federal Insurance Company under its financial institution bond. Filing 91 at 6; filing 101 at 7. Pursuant to the bond, Federal agreed to indemnify Ameritas for losses resulting "directly from dishonest acts . . . of any Employee[.]" Filing 1-7 at 3. Applying that language, Federal approved Ameritas' claim in part. Specifically, Federal concluded that Ameritas was entitled to coverage for the $1,301,783.35 it paid to victims of scheme one. *See* filing 91 at 8; filing 92-1 at 4. After all, Muskey stole *directly* from Ameritas under that scheme, inducing the company "to issue checks on its accounts, which Muskey deposited into his account." Filing 101 at 1; filing 1-8 at 4. Federal has paid on that part of the claim, and it is not at issue here.

Federal denied coverage, however, to the $779,342.88 Ameritas paid to victims of scheme two. Filing 91 at 8; filing 101 at 10. According to Federal, Ameritas did not suffer a direct loss under that scheme because Muskey's customers voluntarily transferred their money to Muskey Financial. So, the customers—not Ameritas—suffered the initial loss, which Ameritas absorbed by settling the customers' third-party tort claims. Filing 101 at 2; filing 1-8 at 4. Federal contends that such derivative liability is too remote, and thus

- 3 -

indirect, to trigger coverage under the bond. *See* filing 87 at 3; filing 101 at 2. Ameritas has sued Federal for its denial of coverage, and both parties have moved for summary judgment. *See* filing 86; filing 90.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The existence of a mere scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Torgerson, 643 F.3d at 1042.

## DISCUSSION

As noted above, the parties' dispute centers on a provision of the financial institution bond—or "fidelity bond"—that insures against employee dishonesty. Under that provision, Federal agreed to pay Ameritas for "[l]oss resulting directly from dishonest acts . . . of any Employee[.]" Filing 1-7 at 3. The parties agree that Muskey was, at all relevant times, an "employee" as that term is defined under the policy, and that he engaged in "dishonest acts" in the manner described above. *See* filing 1 at 4; filing 1-8 at 4. The parties disagree, however, on whether the $779,342.88 paid to Muskey's victims was a "loss resulting directly from" that dishonesty.

Ameritas argues that the loss was direct, and that Federal breached the agreement in denying coverage. That result follows, Ameritas argues, because the "direct loss" provision encompasses general principles of proximate cause. *See* filing 91 at 4. And here, Ameritas says, there is "not . . . any doubt" that Muskey's dishonesty was the proximate cause of Ameritas' loss. Filing 91 at 4. But according to Federal, the fidelity bond does not insure against Ameritas' liability to third persons, even if such liability stems from employee dishonesty. *See* filing 87 at 12, 17. Stated another way, Federal contends that losses resulting from "potential liabilities" (*i.e.*, third party tort claims) are necessarily *indirect*, and thus precluded from coverage under the terms of the bond. *See* filing 87 at 13-21.

As a preliminary matter, the financial institution bond does not contain a choice of law provision. And while the parties generally agree that Nebraska law applies, filing 87 at 13; filing 91 at 14-15, Ameritas loosely argues that, should Nebraska law foreclose coverage, "further choice of law

analysis would be required." Filing 91 at 15. And that analysis, Ameritas contends, would require application of Pennsylvania law, because the "subject matter giving rise to this litigation [*i.e.*, Jason Muskey] was located in Pennsylvania." Filing 91 at 26. That is true, it suggests, even though (a) it is a Nebraska-based corporation; (b) the bond was issued in Nebraska; and (c) the bond was negotiated by a Nebraska-based broker. *See* filing 1 at 2; filing 102-1 at 2-3.

That argument is misplaced. Under Nebraska's conflict-of-law rules, courts look to principles of contract formation, not—as Ameritas suggests here—the location of the alleged loss. *See Johnson v. U.S. Fid. And Guar. Co.*, 696 N.W.2d 431, 441-42 (Neb. 2005). In other words, in determining which law to apply, courts consider various contacts between the parties, such as the place of contracting, the domicile and principle place of business of the parties, and the place of contract negotiation. *Mertz*, 625 N.W.2d at 202. And here, as stated above, those factors undeniably support the application of Nebraska law. As the Nebraska Supreme Court has acknowledged, that outcome "enhances the predictability of the parties' contractual rights and obligations by removing the constant variable of different states in which [the insured's risk may arise]." *Johnson*, 696 N.W.2d at 443.

### (a) "loss resulting directly from"

A fidelity bond offers indemnification coverage for various risks, including—as relevant here—employee dishonesty and theft. The agreements typically limit coverage to losses "directly" caused by covered conduct, and are triggered "only in the event of a loss sustained by the insured." *KAMI Kountry Broadcasting Co. v. U.S. Fidelity & Guarantee Co.*, 208 N.W.2d 254, 256 (Neb. 1973). To that end, fidelity bonds—unlike third-party beneficiary

contracts—are a form of direct insurance, "procured by [the insured] in favor of [itself]." *Id.* (citing 13 Couch on Insurance 2d, § 446:1, 446:2).

The parties' dispute tracks a long-running disagreement regarding the meaning of "direct" as that term modifies "losses" (or other terms) in the same or similar agreements. That disagreement has resulted in two interpretive camps—the "'proximate cause' camp and the 'direct means direct' camp." *Universal Mortg. Corp. v. Württembergische Versicherung AG*, 651 F.3d 759, 761-62 (7th Cir. 2011). The primary dispute between the two camps is whether courts should import tort causation principles when interpreting employee dishonesty provisions. *Id.*

Ameritas' argument, like most insureds, falls in the proximate cause camp. To that end, Ameritas argues that the phrase "losses resulting directly from" requires, for purposes of indemnification, that its losses be proximately caused by the fraudulent or dishonest acts of its employees. *See* filing 91 at 17. So, a cause is "direct" under Ameritas' interpretation if it "plays a substantial role in the ultimate result." Filing 91 at 4; *see Resolution Trust Corp. v. Fidelity and Deposit Co. of Maryland*, 205 F.3d 615, 656 (3rd Cir. 2000) (applying New Jersey law); *Jefferson Bank v. Progressive Cas. Ins. Co.*, 965 F.2d 1274, 1282 (3d Cir. 1992) (Pennsylvania law).

Federal urges a stricter interpretation, pointing to jurisdictions which interpret "direct" as "immediate." *See Tooling, Mfg. and Tech. Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665, 674-75 (6th Cir. 2012) (collecting cases). Coverage is generally denied under that interpretation when, as here, the insured's loss is a result of third party tort or contract liability. *See Universal Mortg. Corp.*, 651 F.3d at 763 (the bond does not cover losses sustained by the insured as a result of third-party contract liability); *Vons Cos., Inc., v. Fed. Ins. Co.*, 212 F.3d 489, 492-93 (9th Cir. 2000) ("direct loss" provision does not

provide indemnity for "vicarious liability for tortious acts of [the insured's] employee"). Federal further contends that, even assuming the proximate cause standard controls, coverage was appropriately denied because "courts universally recognize that payment of a liability is not covered" under the same or similar employee dishonesty provision. Filing 105 at 9.

*Nebraska Law*

Under Nebraska law, an insurance policy is a contract, and therefore typical rules of contractual construction apply. *Winfield v. CIGNA Companies*, 532 N.W.2d 284, 286 (Neb. 1995). The Court construes an insurance policy to give effect to the parties' intent as expressed in the language of the policy. *Poulton v. State Farm Fire and Cas. Co.*, 675 N.W.2d 665, 671 (Neb. 2004). If the terms of the policy are clear, they are to be accorded their plain and ordinary meaning. *Farm Bureau Ins. Co. v. Witte*, 594 N.W.2d 574, 581-82 (Neb. 1999). If the policy language is ambiguous, it will generally be construed in favor of the insured. *Reisig v. Allstate Ins. Co.*, 645 N.W.2d 544, 550 (Neb. 2002).

This Court concludes that "direct" as used in the fidelity bond is unambiguous, and requires a more immediate nexus than Ameritas urges here. That interpretation is informed, at least in part, by the Nebraska Supreme Court's decision in *KAMI*, 208 N.W.2d 254. In *KAMI*, an employee of KAMI Broadcasting forged promissory notes to a Nebraska bank without KAMI's knowledge or permission. The bank, after disbursing the funds, demanded repayment from KAMI, threatening to pull its advertising from the company if it did not comply. *Id.* at 255. Although not legally liable for its employee's actions (a point which all parties conceded), KAMI reimbursed the bank over $4,000.00. *Id.*

KAMI filed a claim under its fidelity bond, which insured against "any loss of money . . . sustain[ed] . . . through any fraudulent or dishonest act or acts" of any employee. *Id.* at 254. The insurer denied the claim, and KAMI filed suit. The Nebraska Supreme Court, in affirming the trial court's dismissal of KAMI's claim, noted that KAMI

> suffered no direct loss as a result of the fraudulent acts of its manager. The pleadings indicate this fraud was directed at the bank and that it was the one defrauded by the acts of KAMI's manager. KAMI lost only when it determined to pay the bank.

*Id.* at 255. In other words, the Court reasoned, KAMI could not "convert[]" the bank's loss into its own by paying the bank on an obligation "for which it was not liable." *Id.* at 257.

Ameritas argues that *KAMI* is distinguishable because, unlike the insured in that case, Ameritas *was* liable for Muskey's actions.[1] Filing 91 at 16, 20. But that distinction is without a difference. Indeed, the Nebraska Supreme Court expanded on its decision in *KAMI* in two subsequent cases involving employee dishonesty provisions: *Omaha Bank for Cooperatives v. Aeta Cas. and Sur. Co.*, 301 N.W.2d 564 (Neb. 1981) and *Foxley Cattle Co. v. Bank of Mead*, 244 N.W.2d 205 (Neb. 1976). And in those cases, the Court held that coverage is precluded regardless of whether the insured voluntarily pays the third party claimant, as in *KAMI*, or is vicariously liable to that individual or entity, as in *Omaha Bank*. See *Omaha Bank*, 301 N.W.2d at 569 (bond does not insure against consequences of the insured's own torts). Put

---

[1] The Court assumes for purposes of this Memorandum and Order that Ameritas was vicariously liable for Muskey's thefts under both schemes. Neither party argues otherwise.

another way, "[u]nder no reasonable construction of the bond can it be said to insure against [the insured's] liability to third persons[.]" *Id.* at 567 (quoting *Foxley Cattle Co. v. Bank of Mead*, 244 N.W.2d 205, 209 (Neb. 1976)).

It is true, as Ameritas points out, that the subject agreement contains slightly different language than the bonds at issue in *KAMI* and *Omaha Bank*. For example, whereas coverage in *Omaha Bank* required a "loss through" employee misconduct, the provision here requires a loss "resulting directly from" a covered peril. *Compare Omaha Bank*, 301 N.W.2d at 565, *with* filing 1-7 at 3. But that distinction does not render the above-cited cases inapplicable or without precedential value. If anything, Federal's use of "direct" as opposed to "through" strengthens the Court's interpretation of the provision as requiring an immediate (as opposed to substantial) nexus between the triggering event and the insured's loss. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 570 (7th Cir. 2009).

As a final matter, Ameritas argues that the Nebraska Supreme Court, in other insurance contexts, has defined "direct" as "immediate *or proximate* as opposed to remote or incidental." Filing 91 at 16; *see Curtis O. Griess & Sons v. Farm Bureau Ins. Co.*, 528 N.W.2d 329, 332 (Neb. 1995) (emphasis added). But those cases do not involve a standard-issued fidelity bond like the one at issue here. And that is significant because a fidelity bond, unlike other forms of insurance, is not a liability policy. *City of Burlington v. Western Sur. Co.*, 599 N.W.2d 469, 472 (Iowa 1999). In any event, the Court agrees with Federal that under *KAMI* and *Omaha Bank*, coverage would be foreclosed *even if* the Court were to adopt the "immediate or proximate" rationale noted above. Indeed, those cases clearly suggest that losses resulting from third party tort claims are necessarily *indirect*, and thus precluded under the terms of the bond. *See KAMI*, 208 N.W.2d at 255.

For those reasons, the Court concludes that Federal did not breach the parties' agreement in denying coverage under the bond. Accordingly, Federal's motion for summary judgment will be granted.

### (b) Remaining Claims

Ameritas, in addition to its breach of contract claim, has sued Federal for bad faith and unjust enrichment. Filing 1 at 5-6. But as Federal correctly points out, those claims are derivative of—and dependent on—Ameritas' breach of contract action. Filing 47 at 2. In other words, because Federal did not breach the contract, Ameritas' remaining claims necessarily fail as a matter of law. *See Radecki v. Mutual of Omaha Ins. Co.*, 583 N.W.2d 320, 325-26 (Neb. 1998). Accordingly, Federal's motion for summary judgment will be granted as to those claims.

### CONCLUSION

Therefore, the Court concludes that Federal is entitled to judgment as a matter of law. The Court will grant Federal's motion for summary judgment, deny Ameritas' motion for summary judgment, and dismiss Ameritas' complaint in its entirety.[2]

---

[2] There are some discrepancies between Ameritas' motion for summary judgment and its complaint. For example, in its motion for summary judgment, Ameritas seeks $779.342.88 as a result of Federal's alleged breach of contract. Filing 91 at 31. But in its complaint, Ameritas alleges $1,337,474.32 in damages for the same claim. Filing 1 at 5. The Court assumes, based on both of the parties' motions, that Ameritas' claimed loss is $779.342.88, and that the pending cross-motions are fully dispositive of the parties' dispute.

IT IS ORDERED:

1. Ameritas' motion for summary judgment (filing 90) is denied.

2. Federal's motion for summary judgment (filing 86) is granted.

3. Ameritas' complaint is dismissed.

4. A separate judgment will be entered.

Dated this 25th day of October, 2017.

BY THE COURT:

*signature*

John M. Gerrard
United States District Judge